## SAMUEL MARSHALL
### v.
## JOHN C. ENDER.

1. EVIDENCE.—The court is of opinion that the court below was justified in finding that the proof of the negotiation of the securities to appellant, prior to their sale and delivery to appellee, was too uncertain and unsatisfactory to justify a decree in appellant's favor.

2. AGENCY—FRAUD.—Where one of two innocent persons must suffer by the fraud of a third, it must be the one who placed it in the power of such third person to commit the fraud. As appellant, who claims to have bought from his brother-in-law the securities in question (a bond and deed of trust, the time for payment of the bond having been extended by an instrument signed by the parties) placed these securities in the hands of his brother-in-law and clothed him or permitted him to clothe himself with the *indicia* of ownership, he is bound by the latter's sale of such securities to an innocent purchaser.

APPEAL from the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding. Opinion filed November 8, 1886.

Mr. GEORGE F. BLANKE and Mr. FRANCIS LACKNER, for appellant; that after maturity negotiable paper is subject to the fundamental principle of the law of personal property, that no man can be divested of it without his own consent or by operation of law, cited Jennings v. Gage, 13 Ill. 610; Salturs v. Everett, 20 Wend. 275; Wood v. McKean, 18 The Reporter, 359; 2 Parsons on Notes and Bills, 279; Chase v. Whitmore, 21 The Reporter, 682.

The general rule is that one in possession of personal property can transfer to another, by pledge or sale, no greater interest in the property than he himself has: Wright v. Solomon, 19 Cal. 64; Kohler v. Hayes, 41 Cal. 455; Barstow v. Savage M. Co., 64 Cal. 388; Covill v. Hill, 4 Denio, 323; Cowdrey v. Vandenburgh, 101 U. S. 572.

Mr. ISAAC E. ADAMS, for appellee; as to the consequences

of clothing one with *indicia* of ownership, cited Pickering v. Buck, 15 East, 44; Lichbarrow v. Mason, 2 T. R. 63; 2 H. Black, R. 11; 5 T. R. 367; Stalker v. McDonald, 6 Hill, 93; Potts v. Mayor, 74 N. Y. 595.

As to the paper being overdue: 1 Daniel on Negotiable Instruments, § 827; Oates v. Nat. Bk., 100 U. S. R. 248; Goodman v. Simonds, 20 How. 243.

BAILEY, J.  This was a bill of interpleader, brought by Benjamin Lichtenstein against John C. Ender and Samuel Marshall, to require them to interplead in relation to the ownership of a certain bond and a deed of trust on certain lands of the complainant securing the same, of which both Ender and Marshall claimed to be the owner.  A decree being entered directing said defendants to interplead and the cause afterward coming on to be heard as between the defendants on pleadings and proofs, the court decreed that said Ender was the owner of said securities, and ordered the money due thereon to be paid to him.  From this decree said Marshall has appealed to this court.

Said securities consist of a bond in the penal sum of $4,000 bearing date July 15, 1873, executed by Carl H. Carlson to Francis Bradley, conditioned for the payment to said Bradley, his executors, administrators and assigns, of the sum of $2,000, July 15, 1878, with interest at the rate of ten per cent. per annum, and a deed of trust securing the same, executed by said Carlson and wife to Lyman Baird, as trustee, upon certain premises known as 188 Sedgwick street, Chicago. The bond and deed of trust were afterward assigned by Bradley to Nancy Swift, by an indorsement on the bond.  Carlson, the obligor, died before the maturity of the bond, and Carin Carlson, his widow, and Edward L. Hansen, became the owners of the mortgaged premises, subject to the deed of trust.  At the maturity of the bond, Nancy Swift agreed to extend the payment thereof until July 15, 1881, said Hansen and Mrs. Carlson entering into a written agreement to pay said bond on the 15th day of July, 1881, with interest at the rate of eight per cent. per annum, payable semi-annually, and ex-

ecuted their promissory notes to her for said several installments of interest.

At the time said period of extension expired, said bond and deed of trust appear to have been in the hands of one Charles A. Schmidt, the bond being then indorsed in blank by Nancy Swift; and Hansen and Mrs. Carlson being unable to pay said bond, applied to said Schmidt, as the legal owner of the securities, for a further extension of three years, which extension was agreed to by said Schmidt, and an agreement was thereupon executed by Hansen and Mrs. Carlson, under their hands and seals, and delivered to Schmidt, in which, after reciting the previous history of said securities, and the application by Hansen and Mrs. Carlson to Schmidt, "the present legal holder and owner of said bond," to extend the time of payment of the principal sum due thereon, set out an agreement on the part of Schmidt to extend and postpone the payment of said principal sum to July 15, 1884, the interest to be paid semi-annually at the rate of seven per cent. per annum, and an agreement on the part of Hansen and Mrs. Carlson, in consideration thereof, to pay said Schmidt, his legal representatives and assigns, said principal sum, on the 15th day of July, 1884, with interest at the rate aforesaid, on the 15th day of each January and July during the period of extension, according to the tenor and effect of six coupons, bearing even date with said agreement. There was also contained in the agreement a stipulation that time should be of the essence of the contract, and that in the event of a failure to pay either of said coupons at maturity, the principal sum should at once become due and payable, at the election of said Schmidt, his legal representatives and assigns, and might be collected without notice, together with the interest. Also a stipulation that nothing in the agreement should operate to discharge or release the legal representatives of Carl M. Carlson, their successors or assigns, heirs, executors, or administrators, from their liability upon said bond, it being expressly understood that the agreement was to be taken as collateral and additional security for the payment for said bond. Accompanying the contract were six coupon notes for the inter-

est, executed by Hansen and Mrs. Carlson, payable to the order of Schmidt.

In September, 1884, defendant Ender purchased said bond and the accompanying securities of Schmidt, paying him $2,000 therefor, and Schmidt, after indorsing the interest notes in blank, delivered the bond, deed of trust, agreement and interest notes to him. As each of the several interest notes became due, except the last, they were presented by Ender to Schmidt, and were paid by him. Said securities remained in Ender's possession, except a short period during which he seems to have deposited them in a bank as collateral security for a promissory note which he had indorsed for another party, and it does not appear that Ender had any notice of any adverse claim to said securities on the part of defendant Marshall, until September, 1884, when this bill was filed. The property covered by the deed of trust was sold by Hansen and Mrs. Carlson to Lichtenstein, the complainant, in 1882. One of the vendors testifies that said sale was made in 1883, and the bill alleges that the complainant purchased said premises on the 8th day of March of that year, and this allegation is admitted in the answers of both the defendants. There is no evidence that Lichtenstein had any interest in said premises prior to that date. The foregoing facts are substantially uncontradicted.

On the part of the defendant Marshall it is claimed that a few days prior to July 15, 1881, Marshall, whose business is that of a sailor on the lakes, met Schmidt, who was his brother-in-law, when Schmidt told him that he knew of an opportunity for the investment of $2,000 on good security; that Schmidt thereupon gave him his card, on the back of which was written a brief description of the property covered by said deed of trust, and informed him that, as additional security, there was an insurance on the property of $3,000; that Marshall soon after went to see the property and found it satisfactory and so informed Schmidt; that thereupon Marshall, on or about the 12th day of July, 1881, placed in Schmidt's hands the sum of $2,000 to be invested in said securities; that Schmidt then told him that said papers were in the hands of

Baird & Bradley, but that he would go and get them and make everything all right; that Marshall then went out on the lake, returning in a week or ten days, when he again saw Schmidt, who informed him that he had all the papers made out on the 15th of the month, and proposed, as Marshall was on the lakes and not much at home, to take care of the papers for him, and put them in his (Schmidt's) safe; that Marshall never saw or had possession of said papers, but left them in the care and custody of Schmidt; that afterward Marshall, both personally and by his wife, applied to Schmidt for certain sums of the interest on said securities, and received various sums of money from time to time which Schmidt paid him on account of such interest; that about July or August, 1884, Schmidt fell sick, and Marshall, for some reason, suspecting that something was wrong about said securities, applied to Schmidt for them, and was told that they were at the bank; that Marshall went to the bank and was there informed that they were claimed by another person; that Schmidt thereupon told Marshall that if he would wait a few days until he got around again, he would make everything right. A few days afterward Schmidt died.

The proof of the foregoing facts rests almost exclusively upon the testimony of Marshall, and there is much in his testimony which is confused, contradictory and unsatisfactory. He testifies, and reiterates the statement, that during the first negotiations with Schmidt in relation to the investment of said money, Schmidt referred to the premises in question as belonging to Lichtenstein, and said that Lichtenstein was to make out the papers; that Lichtenstein would be in on the 15th of the month and would then execute the papers, and that he supposed that he was loaning the money to him, when in fact Lichtenstein did not own the premises or have any interest in them, or any connection whatever with the matter, until nearly two years afterward. Many, if not most of the facts in relation to his alleged purchase of the securities in question, though stated positively and unequivocally in his direct testimony, are rendered more or less uncertain and doubtful by his statements and admissions on his cross-

examination; and, upon consideration of his entire evidence, we can not say that the court below was not justified in finding that the proof of the negotiation of said securities to him, prior to their sale and delivery to Ender, was too uncertain and unsatisfactory to justify a decree in his favor.

· But there is another ground upon which the decree may be sustained. At the time of the sale and delivery of the securities to Ender, the legal title and ownership of said securities was apparently in Schmidt. On or just before the 15th day of July, 1881, at the time the former extension expired, as has been stated, Schmidt obtained the possession of the bond and deed of trust, the bond being indorsed in blank by the former holder. It may be admitted that he gained such possession at the instance and as the agent of Marshall, but, in performing the duties of his agency, he dealt with said securities as though they were his own. The owners of the equity of redemption applied to him, as owner of the bond and deed of trust, for an extension of the day of payment, and he, assuming that character, entered into an agreement with them, under their seals, in which he was expressly styled the legal owner and holder of the bond, and by which they covenanted to pay the principal of the bond to him, his assigns and legal representatives, at the expiration of the period of extension, and in the meantime to pay him interest thereon at the rate of seven per cent. per annum; and they also executed and delivered to him their promissory notes, payable to his order, for the several installments of interest. By this means he certainly became invested with the apparent ownership, if not with the actual, legal ownership. This contract with the owners of the equity of redemption, which became at least a subsidiary security, was with him, and was capable of being enforced at law only in his name, and suit on the interest notes could have been brought only by him.

It can not be said that the mode adopted by Schmidt to obtain these securities for Marshall, his principal, was outside of the purview of his powers as agent. He was employed by Marshall to invest for him $2,000 in certain securities, but the mode of obtaining the title to the securities,

and the details of the arrangement with the makers of the securities, or those incidentally liable thereon, were left wholly to his discretion. No restrictions whatever in that respect were laid upon him. He was, as to that particular matter, in the fullest sense, the general agent of his employer. Whatever he did then in that behalf was in law the act of his principal.

It is of no consequence, so far as this point is concerned, that Schmidt did not show the papers to Marshall or report to him what he had done. Marshall trusted him implicitly, and apparently had no care for such report. But he is nevertheless responsible for what his agent did, precisely as though he had done the same thing himself. If Marshall had in person superintended the drafting and execution of these papers relating to the extension of the bond, no one, we presume, would have doubted his responsibility for the apparent ownership of the securities with which his agent would be thereby clothed. There is no difference in law, however, between the acts performed by a duly authorized agent and those performed by the principal, in their binding effect upon the rights of the latter.

Marshall, having thus placed these securities in the hands of Schmidt and clothed him, or permitted him to clothe himself, with the *indicia* of ownership, is bound by what Schmidt did as the apparent owner, upon the familiar principle that where one of two innocent persons must suffer by the fraud of a third, it must be the one who placed it in the power of such third person to commit the fraud. Enders was an innocent purchaser from one who was clothed by Marshall with the power and the apparent right to sell, and upon the principle above stated, his title must be upheld. We are of the opinion that the decree was justified by the evidence, and it is therefore affirmed.

Judgment affirmed.